KNOWLTON BROS. v. NEW YORK AIR BRAKE CO. et al.

(Supreme Court, Appellate Division, Fourth Department.  July 7, 1915.)

1. WATER AND WATER COURSES ⊜⟶160—PRESCRIPTIVE RIGHTS—PERIOD.

To the acquisition of a prescriptive right to divert the waters of a stream by the maintenance of a dam, such maintenance must have a duration of 20 years.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 193, 195; Dec. Dig. ⊜⟶160.]

2. WATERS AND WATER COURSES ⊜⟶154—PURCHASE OF LAND—IMPROVEMENTS—DAM.

One buying land, to which a dam is affixed so as to become a part of the realty, acquires the dam itself.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 167–173; Dec. Dig. ⊜⟶154.]

3. WATERS AND WATER COURSES ⊜⟶160—PRESCRIPTIVE RIGHT—INTERRUPTION.

Where the owners of land on the south channel of a stream diverted water thereto from the north channel by the construction of a dam, which was affixed to the realty on the north bank of the north channel, and thereafter such land on the north channel was purchased, the buyer beginning to utilize the dam to furnish power to his cotton mill, such use, continuing for 5 years, constituted an interruption of any period whereby the south channel owners might have gained a prescriptive right to divert the water.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 193, 195; Dec. Dig. ⊜⟶160.]

4. WATERS AND WATER COURSES ⊜⟶160—PRESCRIPTIVE RIGHTS—INTERRUPTION.

Where the riparian owners of the south and north channels of a stream owned a dam, which diverted water from the north to the south channel, and upon the burning of the mill of the north channel owner, so that he had no occasion to use the water, the dam was thereafter allowed to stand, its mere standing, having effect to divert the water into the south channel, was not a sufficient adverse user of the water by the south channel owner as to establish a prescriptive right to divert it; since the north channel owner's failure to use his riparian rights after the burning of his mill, for power purposes, could not deprive him of them, unless the south channel owners initiated a new claim of right to divert the waters other than that effected by the dam jointly owned.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 193, 195; Dec. Dig. ⊜⟶160.]

5. WATERS AND WATER COURSES ⊜⟶167—CONSTRUCTION OF DAM—TRESPASS.

Where the owner of one bank of a stream constructs a dam, which rests upon the other bank, not owned by him, the action is a trespass, giving a cause of action to the owner of the land against which the dam abuts.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 192, 194–202; Dec. Dig. ⊜⟶167.]

6. WATERS AND WATER COURSES ⊜⟶176—ACQUISITION AND USER OF DAM.

Where a dam is constructed across a stream resting on land not owned by the builder, and thereafter such land is sold to one who makes use of the dam and does not exercise his right to take it down, he cannot thereafter maintain an action for trespass by such dam.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 237–243; Dec. Dig. ⊜⟶176.]

7. WATERS AND WATER COURSES ⊜⟶176—NATURAL WATER COURSE—DIVERSION—RIGHT OF ACTION.

Where a dam was built across a stream abutting on land not owned by the builder, the effect of which was to divert water to the south shore

and channel owned by the builder, and the land on which it illegally abutted was thereafter sold, and the owner allowed the dam to remain and the water to run into the south channel, he had no right of action for diversion against the builder; his remedy being to take down the dam.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 237–243; · Dec. Dig. ☞176.]

8. WATERS AND WATER COURSES ☞156—CONVEYANCES—RESTRICTIVE COVENANT—EFFECT.

Where a riparian owner owned two parcels of land, and in the conveyance to him of one there was a reservation to the grantor of the right to maintain and repair a dam, which had been illegally constructed abutting against the other parcel of the grantee's land, such reservation as to the first parcel did not affect his right as owner of the second parcel to abate the dam.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 158, 174–183; Dec. Dig. ☞156.]

9. TENANCY IN COMMON ☞15—ADVERSE POSSESSION—"OUSTER."

The use by tenants in common of a dam could not be adverse to a cotenant until there was an ouster of such cotenant, which is an act of exclusion unequivocal in character, since the entry and possession of one tenant in common is deemed the entry and possession of all, and not a disseisin.

[Ed. Note.—For other cases, see Tenancy in Common, Cent. Dig. §§ 42–52; Dec. Dig. ☞15.

For other definitions, see Words and Phrases, First and Second Series, Ouster.]

10. COVENANTS ☞51—CONVEYANCES—CHANGE OF PROPERTY BENEFITED.

Where a riparian owner conveyed part of his lands, by restrictive covenant forbidding the grantee to make any use of the land for hydraulic purposes, which covenant was made for the benefit of the grantor's lands on the other side of the river, by a subsequent deed conveying to a third person the grantee could not substitute other property as that benefited.

[Ed. Note.—For other cases, see Covenants, Cent. Dig. § 50; Dec. Dig. ☞51.]

11. COVENANTS ☞51—CONSTRUCTION—RESTRICTIVE COVENANT—EFFECT OF GRANTEE'S RESTRICTION.

Where the grantor of riparian lands by covenant restricted the right of the grantee to erect hydraulic works, which covenant was intended for the benefit of the grantor's remaining lands, and thereafter the grantee, in conveying the lands, attempted to make a restrictive covenant for the benefit of other property, such act of the grantee was unavailing.

[Ed. Note.—For other cases, see Covenants, Cent. Dig. § 50; Dec. Dig. ☞51.]

12. COVENANTS ☞103—RESTRICTIVE COVENANT—WAIVER.

Where lands were conveyed subject to restrictive covenant that they might not be used for hydraulic purposes, and thereafter the grantee's successor made a large investment in a cotton mill operated by water power, the grantor and his successors consenting to waive the restriction to secure the erection of the mill, such waiver or consent waived and destroyed the restriction on the granted lands altogether.

[Ed. Note.—For other cases, see Covenants, Cent. Dig. § 169; Dec. Dig. ☞103.]

13. COVENANTS ☞103—CONSTRUCTION—RESTRICTIVE COVENANT.

Where a riparian owner conveyed part of his lands, by restrictive covenant prohibiting the erection thereon of hydraulic works, and thereafter conveyed to his grantee's successor in title the river bed surrounding the

lands conveyed under restriction, such second conveyance restored to the lands first conveyed the riparian rights withheld by the restriction.

[Ed. Note.—For other cases, see Covenants, Cent. Dig. § 169; Dec. Dig. ☜103.]

14. COVENANTS ☜51—RESTRICTIVE COVENANTS—CONSTRUCTION.

Where riparian lands are conveyed, restricted by covenant forbidding the erection of hydraulic works thereon, such covenant is not of itself an agreement or consent to the diversion of the natural flow of the stream to the other bank.

[Ed. Note.—For other cases, see Covenants, Cent. Dig. § 50; Dec. Dig. ☜51.]

15. COVENANTS ☜51—COVENANT AGAINST HYDRAULIC WORKS—EFFECT.

Where the owner of riparian lands on both sides of a stream conveyed those on one side, by restrictive covenant forbidding the grantee and his successors to erect hydraulic works thereon, which covenant was intended to prevent competition with mills of the grantor on the other side of the stream, such restrictive covenant could not be enforced against a successor of the grantee, operating a manufacture of a sort not in existence at the time the covenant was made, and not competing with the business which the grantor's successor in title then carried on.

[Ed. Note.—For other cases, see Covenants, Cent. Dig. § 50; Dec. Dig. ☜51.]

16. COVENANTS ☜51—RIPARIAN OWNER—RIGHTS.

Where riparian lands were conveyed subject to a restrictive covenant forbidding the erection of hydraulic works thereon, the grantee nevertheless had the right to insist that the water naturally appurtenant to the stream should flow therein against his shore, so that the restrictive covenant could not be construed as giving a right to the grantor, and his successors to divert water from the grantee's shore to their channel by means of a dam.

[Ed. Note.—For other cases, see Covenants, Cent. Dig. § 50; Dec. Dig. ☜51.]

17. COVENANTS ☜51—RESTRICTIVE COVENANT—CONSTRUCTION.

Where a riparian owner of mills on the south channel of a stream conveyed land on the north channel, by restrictive covenant forbidding the erection of hydraulic works thereon, if such restriction could be construed as giving the grantor a right to divert water by a dam to the south channel, it would also be construed as intended to benefit the lands of the grantor on the south channel of the stream, and not those of other mill owners on such channel, to whom he had previously conveyed the properties by perpetual lease, reserving a purely nominal rent of one peppercorn a year, with right of re-entry for breach.

[Ed. Note.—For other cases, see Covenants, Cent. Dig. § 50; Dec. Dig. ☜51.]

18. COVENANTS ☜77—RESTRICTIVE COVENANT—ENFORCEMENT BY PARTY NOT INTENDED TO BENEFIT.

Where riparian lands were conveyed, subject to restrictive covenant forbidding the erection of hydraulic works thereon, owners of property not intended to benefit thereby could not enforce it.

[Ed. Note.—For other cases, see Covenants, Cent. Dig. §§ 77–89; Dec. Dig. ☜77.]

Appeal from Special Term, Jefferson County.

Action by Knowlton Bros. against New York Air Brake Company, George A. Lance, the Watertown Light & Power Company, James B. Wise, the Case Lumber & Roofing Company, and others. Judgment for plaintiff, and the named defendants appeal; the New York Air

Brake Company also appealing from an order denying its motion to correct the judgment in reference to certain taxable disbursements. Reversed, and new trial ordered.

Black river flows through the city of Watertown in a course from east to west. It is divided into two channels at that point by a large island, now known as Beebee's Island. There is a fall in each channel on each side of the island, which has been availed of since near the beginning of the last century for the development of water powers. Plaintiff owns mills on the south shore of the south channel, the defendant the New York Air Brake Company a manufacturing plant upon the island, and the defendant the Watertown Electric Light & Power Company a power plant on the north shore of the north channel opposite the island. These are the principal power owners, but the other defendants also own smaller powers, some on one channel and some on the other, and the defendants together own all the water powers at this location, and all the land upon which powers can be developed.

This action was begun to restrain the defendant the New York Air Brake Company from increasing its development, so as to use and appropriate more of the water of the river than it had formerly done, and also to determine and define the rights and limits of all the parties to take and use the water of the river for power purposes. At the time this action was begun, and since the year 1869, dams have existed across each channel near the head of the island, which have created in the river above them a common pond. There is also a lower dam across the south channel, below the lands of the parties to this action, and below the water rights involved; but no question is presented in this case as to the powers and water rights upon such lower dam.

In 1806 Jonathan Cowan acquired title to all the lands on the south shore of the river at the location in question, and the whole of the island. He therefore owned and controlled the water rights on both sides of the south channel and those appurtenant to the north bank of the island to the center of the north channel. He did not own any land on the north shore of the north channel. He first built a dam across the south channel considerably further down the stream than the present dam. He erected several mills, taking their power from this dam, and from time to time sold them; his conveyances being almost uniformly in the form of perpetual lease, reserving a rent of one peppercorn, payable at a certain date annually, if demanded. He also inserted covenants on the part of the grantees for the payment of taxes, the repair of the dam and the flumes, and reserved a right of re-entry for breach of these covenants, or for nonpayment of the rent reserved. Having established these mills, he sold and conveyed all of them, except a woolen mill, prior to 1822. They were all located on the south shore of the south channel. He had at that time established no mills on the south shore of the island.

In 1822 he conveyed to Thomas Mosher by perpetual lease the east end of· the island, being about one-half thereof, bounding the grant by low-water mark at all points where the island touched the river, except that part of the north shore which was west of the falls in the north channel, where he bounded the grant by the top of the high bank. This deed or perpetual lease contained the following covenant on the part of Mosher: "And the said party of the second part, for and in consideration of the covenants above mentioned, for himself, his heirs, executors, and administrators, doth covenant, grant, promise, and agree to and with the party of the first part, his heirs and assigns, that he will not erect, build, construct, or carry on any hydraulic or water works upon the above-described premises of any nature or kind whatsoever, and that he, the said party of the second part, will build, construct, and erect a dwelling house upon the said premises within one year from this date to be worth $100, and that he will at all times and on all occasions hereafter permit the said Cowan to go onto the rocks at the water's edge, and to build onto said rocks a dam, and the privilege of passing and repassing to and from in order to build, rebuild, or repair said dam, without let, hindrance, or molestation." Mosher continued to own these lands until October 31, 1825, when, by the same form of perpetual lease, he conveyed the same lands by the same description to Chillingsworth Colwell and Otis Colwell, and the grantees also covenanted not to erect on the lands any

hydraulic works, and also made a covenant in reference to the dam as here-after stated.

By warranty deed dated January 16, 1827, Cowan conveyed to said Colwell and Colwell all the land in the river bed surrounding the lands conveyed to Mosher to the center of the channel of the river in both channels, including the land out of water and under water. This deed contained a clause as follows: "That no right is hereby conveyed to the said parties of the second part, their heirs or assigns, to erect any works for the grinding of any species of grain or any works for the carding or manufacture of any species of animal wool. And it is hereby further understood that this conveyance is not to interfere with any grants heretofore made by the said Jonathan to any person or persons, including the right of repairing and keeping at its present elevation the dam at the head of the island across the main stream, with the wing running from the main dam to the head of the island, and for that purpose of passing and repassing on the above-described premises, doing as little damage as possible."

On the same day, January 16, 1827, Colwell and Colwell by full-covenant deed conveyed to Levi Beebee all the lands which Cowan had conveyed to Mosher, except a small lot 30 feet wide on the island shore of the south channel, and all the river bed which he had conveyed to Colwell and Colwell. The covenant against hydraulic works was not included in this deed, but the deed did include the following clause: "It being expressly understood, anything in this instrument to the contrary notwithstanding, that no right is conveyed to the said party of the second part, his heirs or assigns, to erect any works for the grinding of any species of grain or the carding and manufacture of animal wool. It is also further understood that the parties of the first part reserve to themselves the right of repairing and keeping at its present elevation the dam at the head of the island across the main stream, with the wing running from the main dam to the head of the island, and for that purpose of passing and repassing on the above-described premises, doing as little damage as possible."

Prior to this, and on July 8, 1824, Cowan had conveyed by perpetual lease to Northrup & Holt the tannery lot, so called, on the south shore of the island, which had not been included in the deed to Mosher. In this lease Cowan covenanted to keep in repair the dam across the south channel, and also "that he will keep in good repair the dam erected across the main stream above the mill seat forever hereafter, and rebuild, if necessary, at his own cost and expense."

Beebee in 1828 acquired title to the lands on the north shore of the north channel, extending westerly as far as the westerly line of Mosher's land on the island, and extending easterly above the head of the island, and above and beyond the dam which Cowan had erected across the main channel in or about the year 1824. Beebee thereupon erected a cotton mill upon the north shore of the island on the Mosher land, and cut in the rocks a channel to the river at a point south of the east end of the island, and took water from that point from the south channel to run his cotton mill. This cotton mill was destroyed by fire in 1833, and was never rebuilt, and there has since been no use of water power on the north shore of the island.

In 1869 a freshet destroyed both of the Cowan dams, and thereupon all the predecessors in title of the parties to this action entered into a contract by which the dams were to be rebuilt at once, the one on the north channel to be planned and located by the owners upon that channel, and one Luther J. Dorwin, an attorney at law, was appointed and authorized to make an examination of the title of each of the parties in and to water rights upon these dams, and to report the rights and interests of the several parties. The agreement provided that the expense of the reconstruction of these dams and of their future maintenance should be apportioned between the parties in accordance with their respective interests in the water power as found and reported by the said Dorwin. The dams were reconstructed at once; the one on the north channel being located further downstream than the original Cowan dam. Dorwin took about a year to investigate the titles, and finally made a report to the general effect that the riparian rights naturally appurtenant to the shores of the island and of the north and south banks still existed, unaffected by the conveyances or otherwise, and that the owners on each of the main shores of the

river were entitled to the use of the water on the north shore to the north half of the north channel, and on the south shore to the south half of the south channel, and on each of the shores of the island, from the shores of the island to the center of the channel on each side, and that thus the owners on each shore were entitled to the use of one-fourth of the water of the. river, and on that basis he apportioned among the several owners the cost of the reconstruction of the dams and of their future maintenance. The owners paid upon that basis for the cost of the new dams, and have since paid on that basis for their maintenance and repair. The Dorwin agreement provided, however, that Dorwin's report should not change or affect the legal rights of the parties to water rights, but should determine only the apparent right of each party, and that, whenever thereafter it should be determined in any competent manner that the rights of any of the parties were different than as found by Dorwin, there should be a readjustment of the amounts paid for the construction of the dams and their maintenance accordingly, but that until such a determination the parties should use the water and pay for the maintenance of the dams in accordance with their interest in the water powers as shown by the Dorwin report.

The referee has found, in substance, that Cowan elected to develop on the south channel all the waters of the river to which he was entitled, including the south half of the north channel; also that plaintiff and its predecessors in title on the south shore of the south channel have acquired by prescription the right to divert all the waters of the north channel into the south channel, except a limited quantity which has been used on the north shore of the north channel since about the year 1840. He has also found that the restriction against hydraulic works upon the Mosher land is still in force, and prevents the defendant the New York Air Brake Company from developing any hydraulic works upon the Mosher land which it now owns, or upon the north shore of the island.

Argued before KRUSE, P. J., and ROBSON, FOOTE, LAMBERT, and MERRELL, JJ.

Elon R. Brown, of Watertown, for appellants New York Air Brake Co. and Case Lumber & Roofing Co.

Arthur C. Rounds, of New York City, for appellant Watertown Light & Power Co.

W. W. Kelley, of Watertown, for appellant Wise.

George S. Hooker, of Watertown, for appellant Lance.

Edward N. Smith, of Watertown (Pardon C. Williams, of Watertown, and Louis L. Waters, of Syracuse, of counsel), for respondent.

FOOTE, J.  [1-4] Assuming that when, as early as 1824, Cowan extended his dam across the north half of the north channel and abutted it against the north bank on lands which he did not own, it was his intention to divert the waters of the north channel into the south channel for the benefit of water lots or powers on that channel, as the referee has found, still no prescriptive right to so divert the water could arise until he had continued to maintain this dam and divert the water for 20 years. We must assume on the evidence and findings that this dam was not extended to the north bank earlier than the beginning of the year 1824. In January, 1828, Beebee acquired title to the north half of the north channel on which this dam stood. If the dam was so affixed as to become part of the realty, he then owned the dam itself. He began at once to utilize this dam to furnish power to his cotton mill, and continued to so use it until the cotton mill burned in 1833, without objection, so far as appears, from the owners on the south channel.

This certainly interrupted any claim on the part of the south channel owners to divert all the water into that channel. Certainly during this period the south channel owners were not maintaining this dam adversely to Beebee. It was then Beebee's dam, and he used it as much as did the south channel owners. At the time the cotton mill burned in 1833 we think the legal relations between the south channel owners and Beebee in respect of this dam were practically the same as if they and Beebee had originally joined in its construction. If this be so, then Beebee and his successors in title to the east end of the island and to the north shore of the north channel did not thereafter lose any of their riparian rights along the north channel by failure to make use of them for power purposes, unless the south channel owners did something to initiate anew a claim of right to divert the north channel waters into the south channel.

The evidence does not disclose any act on the part of the south channel owners of that character. They did, it is claimed, use the water, but not to the injury of the north channel owners, who, until 1840, had no use for the water, and therefore no occasion to object to any use which others might make of it. In 1840 the dam was pierced, and a flume and wing dam constructed to supply the checkered mill on the north shore of the north channel. No attempt was made to prevent this by any of the south channel owners, nor did they object or question the right so to do. The dam at that time had not been in existence for 20 years. If the adverse user was interrupted by Beebee's purchase of the land on which the dam rested and abutted, and his use of the dam until 1833, and no new adverse user as against the north channel owners was initiated after that time, then we think the mere continued standing of the dam thereafter, even if its effect was to divert the water into the south channel, was not adverse, or sufficient to establish an adverse claim on the part of the south channel owners, although continued for more than 20 years. Conabeer v. N. Y. C. & H. R. R. R. Co., 156 N. Y. 474, 51 N. E. 402; 3 Farnham on Waters, § 2294; Townsend v. McDonald, 12 N. Y. 382, 64 Am. Dec. 508; Gould on Waters (3d Ed.) § 204; Burnham v. Kempton, 44 N. H. 78; Brown v. Bowen, 30 N. Y. 519, 86 Am. Dec. 406; Washburn on Easements, p. 152.

[5] The great and leading fact upon which the finding of an adverse user against the north channel owners rests is the construction by Cowan of this dam across the north channel upon and against lands which he did not own. This was a trespass, and afforded a cause of action in favor of the owner of the land against which the dam abutted. Bliss v. Rice, 17 Pick. (Mass.) 23.

[6-8] But clearly, after Beebee became the owner of the land on which the dam rested and the shore against which it abutted, and had for 4 years himself made use of the water stored up by this dam, he could not then have maintained an action against any south channel owner. He had become the owner of the dam and had applied it to his own use. If he saw fit to allow the dam to remain, and not to make use of the power so developed, but allowed the water to run into the south channel, certainly that afforded him no cause of action. If he wished to prevent it, he had simply to take down his dam, and as owner of the

land on the north shore against which the dam abutted he had the right to take it down, notwithstanding the reservation contained in the deed to him of the east end of the island to permit Cowan and his successors to maintain and repair the dam. This reservation did not affect him as owner on the north shore. So it seems to us that the elements for establishing a prescriptive right in favor of the south channel owners after 1833 are lacking in this case.

[9] Beebee, at about the time he acquired title to the land on which the dam rested, also purchased other land which Cowan owned on the south shore of the island, which had water rights, and lands on the lower end of the island on the south channel. Thus he had a motive and direct personal interest to maintain the dam across the north channel, in so far as it benefited these water powers of his on the south channel. If Beebee was not the sole owner of this dam, he had such an interest in it as would make him a tenant in common with the other south channel owners, and until these other owners did something equivalent to an ouster of Beebee or his successors there was nothing adverse to them in the use which the south channel owners made of the dam. The entry and possession of one tenant in common is deemed the entry and possession of all, and not a disseisin. There is no ouster, unless there are acts of exclusion of other owners unequivocal in character. Warren v. Westbrook Mfg. Co., 86 Me. 32, 29 Atl. 927, 26 L. R. A. 284; Northrop v. Wright, 24 Wend. 221; Culver v. Rhodes, 87 N. Y. 348.

Assuming, however, that the covenants and restrictions in the deed to Mosher were intended to provide for the construction of a dam across the north channel to divert the waters of that channel into the south channel, we are of opinion that plaintiff is not in a position to invoke the equitable jurisdiction of this court to restrain the defendant the New York Air Brake Company from the erection of hydraulic works upon the Mosher lands for the following reasons:

(1) Because the restriction against hydraulic works was waived and abrogated by the subsequent vesting in Colwell and Colwell, after they purchased the Mosher lands, of the title to the surrounding river bed, and the acquiescence and apparent consent of all parties then interested in the Beebee cotton mill development.

(2) It does not appear that the purpose of the north channel dam was to divert north channel waters rather than to create a better head at the south channel dam, or to prevent the south channel dam from diverting its waters into the north channel.

(3) That the restriction against hydraulic works, if intended to provide for diverting north channel waters into the south channel, was not intended for the benefit of lands now owned by the plaintiff, and did not create an easement in favor of those lands, but, as is more probable, was for the benefit of Cowan's remaining lands on the south shore of the island, in which plaintiff is not now interested.

We will take up these questions in the order stated above.

First. It is claimed by plaintiff, and has been found by the referee, that the covenant in the deed from Cowan to Mosher of November 9, 1822, of the east end of the island, against the erection on the land con-

veyed of any hydraulic works, is still operative, and that plaintiff is vested with the right to enforce it, and to prevent the defendant the New York Air Brake Company from making any hydraulic development on the end of the island. At the time this deed was made Cowan had parted with all his lands on the south shore of the south channel, except the woolen mill lot. He had, however, some remaining lands on the south shore of the island. The deed to Mosher was limited to the upland, and did not convey any of the land under water surrounding the east end of the island in either channel.

On January 16, 1827, Cowan conveyed to Colwell and Colwell the lands under water in both channels surrounding the lands previously conveyed to Mosher. This deed states that it does not convey to the grantees the right to erect any works "for the grinding of any species of grain or any works for carding or manufacturing of any species of animal wool." Colwell and Colwell had previously, and on October 31, 1825, acquired from Mosher all the upland on the east end of the island which he had acquired from Cowan, and this fact is recited in the deed from Cowan to Colwell and Colwell. So Cowan knew, when he conveyed to Colwell and Colwell the land under water, that they were also the owners of the adjoining land out of water. On the same day, January 16, 1827, Colwell and Colwell conveyed to Beebee all this east end of the island, together with all the land in the bed of the river surrounding the same. In the deed from the Colwells to Beebee there is no covenant against the erection of hydraulic works upon the land conveyed; but it did contain a clause that no right is conveyed to erect any works for the grinding of grain or carding or manufacture of any species of animal wool.

It is the contention of the defendant the New York Air Brake Company that the deed from Cowan to the Colwells of the land under water was intended to vest in the Colwells the water rights appurtenant to the head of the island in both channels. This contention is based, in part, upon the fact that it contains a restriction against works for grinding grain or manufacturing animal wool, thus, in effect, authorizing the use of the power for any other purpose; that it was made in preparation for vesting in Beebee the head of the island, to enable him to construct the cotton mill, and to use the power to operate that mill; and that Beebee proceeded to make that use of it, without, so far as appears, objection from any source. The evidence is ample to sustain a finding that Beebee at least did so understand the effect of Cowan's deed to the Colwells, for otherwise his large investment was made without having any water power which he could rightfully use to drive his mill.

It is plaintiff's contention that the covenant in the deed from Cowan to Mosher against the erection of hydraulic works runs with the land, and that plaintiff is the successor of the rights reserved by Cowan by virtue of that covenant, and may now enforce the covenant and prevent the development of any hydraulic works upon the Mosher lands for the benefit and protection of water privileges of plaintiff on the south shore of the south channel. This presents one of the most important questions involved in the case.

· [10, 11] Mosher conveyed the east part of the island to Colwell and Colwell on October 31, 1825, by deed containing the same covenant against the erection of hydraulic works and a further covenant as follows:

"And that the said parties of the second part will at all times and on all occasions hereafter permit Jonathan, or his legal representatives or successors, or those who may own or occupy the property and gristmill now in possession and occupation of Joseph R. Henderson, to go onto the rocks at the water's edge and to build on said rocks a dam, with the privilege of passing and repassing to and from and in order to build, rebuild, or repair said dam, without let, hindrance, or molestation."

The Jonathan referred to was undoubtedly Jonathan Cowan. This clause would seem to indicate that the parties considered the right to maintain this dam as appurtenant to the gristmill then owned by Joseph R. Henderson. Cowan had disposed of this gristmill, one-fourth in November, 1817, and the remaining three-fourths in July, 1822. Of course, Mosher could not change the beneficiary of his covenant with Cowan, and the rights of the parties must, as we think, be determined by the Cowan deed to Mosher, and cannot be affected by this deed. In other words, if the covenant in Cowan's deed to Mosher was made for the benefit of Cowan's lands on the south side of the island, then Mosher had no right to substitute the gristmill as the property benefited. We cannot construe the covenant in the Cowan deed to Mosher as intended for the benefit of the gristmill because Mosher attempted to make it so three years later.

Colwell and Colwell, having acquired the Mosher lands in October, 1825, bought from Cowan on January 16, 1827, by warranty deed, all the bed of the river to the center of the channel on both sides of the island opposite the Mosher land, extending from the outer line of the Mosher land, where it bordered on the river, to the center of the channel in all directions. This deed, it is contended by the defendants, was made for the purpose and with intent to restore to the Mosher lands the riparian and water rights which, according to plaintiff's contention, the covenants in the Mosher deed had deprived it of. After describing the lands conveyed, this deed contains the following:

"But it is expressly understood and agreed, anything in this instrument to the contrary notwithstanding, that no right is hereby conveyed to the said parties of the second part, their heirs or assigns, to erect any works for the grinding of any species of grain or any works for the carding or manufacture of any species of animal wool. And it is hereby further understood that this conveyance is not to interfere with any grants heretofore made by the said Jonathan to any person or persons, including the right of repairing and keeping at its present elevation the dam at the head of the island across the main stream, with the wing running from the main dam to the head of the island, and for that purpose of passing and repassing upon the above-described premises, doing as little damage as possible."

Thus Cowan parted with the fee of the bed of the river surrounding the Mosher land.

[12] Was it the intent of the parties to restore to the Mosher land all its natural riparian rights, except as limited by the words of the deed against works for grinding grain or manufacturing animal wool? What was the purpose of the grant, if it did not enlarge the rights and

privileges of Colwell and Colwell upon the Mosher land? What was the object of the clause prohibiting the erection of works for the grinding of grain and manufacture of animal wool, if Cowan had previously contracted in his deed with Mosher for a transfer of all the water rights appurtenant to the north shore of the island to the south channel? By what right does Cowan undertake to provide that all the river surrounding the Mosher land in both channels to the center line may be used for any hydraulic works, except to grind grain and manufacture wool, if he had already appropriated the waters of these two channels to the benefit of the south channel powers? Cowan knew at the time he made this deed that Colwell and Colwell had already purchased the Mosher land, for it is so recited in the deed itself. On the same day this deed was made, January 16, 1827, Colwell and Colwell conveyed both the Mosher land and the land in the bed of the river covered by this deed to Levi Beebee, who proceeded, after buying some other land of Cowan in the south channel and purchasing the north shore of the river and all its water rights, including the land on which Cowan's dam rested, or that part of it north of the center of the north channel, to build a cotton mill on the north shore of the island, and to cut a channel in the rocks to take water from the pond made by these two dams at a point in the south channel. He made a large investment in this cotton mill, and operated it with water power for about four years, until the mill burned, without, so far as appears, objection by Cowan or any of the mill owners on the south channel. If the covenant in the Mosher deed against the erection of hydraulic works on the east end of the island was then in force, the cotton mill operation was a plain, bald violation of that covenant, and, according to plaintiff's theory of the case, Beebee's investment could have been practically destroyed by any of the mill owners on the south shore proceeding to enforce against Beebee that covenant. We think it cannot be assumed that Beebee made his large investment without believing that he had a legal right to erect and operate hydraulic works upon the Mosher land. If he did not have that right, and the land was, in fact, restricted against hydraulic works for the benefit of the south channel power owners, and the latter, through Cowan or otherwise, as is suggested by plaintiff's counsel, consented to waive the restriction, so as to secure the erection of the Beebee cotton mill, we think the legal effect of such waiver or consent is to waive and destroy the restriction altogether.

[13] The more reasonable view to take of the matter seems to be that all the parties concerned construed the deed to Colwell and Colwell of the river bed surrounding the Mosher lands as having been made for the purpose of restoring to those lands the riparian rights withheld from them by the restriction against the erection of hydraulic works, and we think we should hold that such was the effect of that deed, at least as regards all hydraulic works, except for the grinding of grain and the manufacture of animal wool.

Having reached the conclusion that the Mosher covenant against hydraulic works has thus been eliminated, it is unnecessary to consider to what extent plaintiff would have succeeded to any rights under it, had it not ceased to exist.

[14, 15] Second. As to the intention of Cowan by the covenants in the Mosher deed to provide for diverting north channel waters into the south channel: It is the theory of the plaintiff that the covenant exacted by Cowan from Mosher against the erection of hydraulic works and the subsequent building of the dam by Cowan across the north channel show an intention on Cowan's part to divert the waters of the north channel into the south channel for the benefit of the powers, or possible powers, on that channel, and this is the view adopted by the learned referee.

It is to be observed that Cowan does not in this deed reserve in plain terms a right to divert north channel waters into the south channel. A covenant against the erection of hydraulic works is not, in and of itself, an agreement or consent to change the natural flow of the river. Cowan and his grantees had built on the south channel mills for almost every variety of manufacture in use at that time, and the object of the covenant against hydraulic works may have been to prevent the erection of mills to compete with those already established, entirely without reference to an intended use of the north channel waters by Cowan or his grantees. If the intent was to prevent competition with existing mills, then plaintiff has no standing to enforce the covenant, because the intended development by the New York Air Brake Company was not for a competing business to any which existed at the time the covenant was made or with the business which plaintiff now carries on.

[16] Notwithstanding the covenant by Mosher not to erect hydraulic works, we think he still had the right to insist that the water naturally appurtenant to the north channel should flow in that channel, at least as regards that part of the north channel above the falls, for there his deed conveyed to low-water mark; that is, to the water of the river. He was thus a riparian owner, and could make any use of the water not against his covenant that he saw fit, or if he had no use to make of it, he still had the right to have the water flow along his premises in the north channel in its natural state and at its natural height. Moreover, it is difficult, if not impossible, to say at this time whether Cowan, when he built the dam across the north channel, thereby intended to divert any of the north channel waters into the south channel. It is impossible to say at this time whether the works installed on the south channel required for their successful operation any greater volume of water than at that time naturally flowed in the south channel. The watershed of the Black river at that time was far more densely wooded than now, and, with substantially the same rainfall, the average normal flow of the river was more uniform, with less water going off in freshets, than at the present time. But it was clearly to the advantage of these wheels to receive the water under greater head, and it is the fact that the dam across the north channel did afford such greater head, and it is quite as probable that was Cowan's primary object in building this dam.

It is also to be noted that the covenant in the Cowan deed to Mosher, to the effect that he would permit Cowan "to go onto the rocks at the water's edge, and to build on said rocks a dam, and to have the priv-

ilege of passing and repassing to and from, in order to build, rebuild, or repair said dam," does not, in terms, refer to a dam to be put across the north channel. It is true that Cowan did, within two years, build the dam across the north channel; but it cannot be said with certainty that the dam which he subsequently built was the one which he had in contemplation at the time he conveyed to Mosher. The language used seems to indicate that he had not built the dam up to that time. Fully half the shore front of the Mosher land was on the south channel. Undoubtedly Cowan could have located the dam at any point he chose in the south channel or in the north channel, and his right to maintain and repair it under this deed would have been the same. But how can it be said with certainty that this clause with reference to the construction of the dam necessarily indicates that Cowan then intended to build such a dam as would divert the north channel waters from their natural course, or that Mosher should have so understood his covenant? Mosher would more naturally expect that Cowan was to build his proposed dam on land which Cowan owned, rather than across the north half of the north channel on lands which he did not own.

[17] Third. For whose benefit were the covenants made in the Mosher deed against the erection of hydraulic works and permitting Cowan to erect and maintain a dam? There were at this time some half dozen mills upon the south shore of the south channel, all but one of which Cowan had previously conveyed by perpetual lease, reserving rent in the form of one peppercorn per year, if demanded, and the right of re-entry for breach of covenant. The woolen mill Cowan still owned. He also owned lands on the south shore of the island. This woolen mill he conveyed to Coburn & Coburn in May, 1824, with the privilege of taking water only from the gristmill flume. This was the second or third right on this flume, so the quantity of water was limited by the size of the flume and by the extent of the prior rights. There is nothing in this conveyance to indicate that any right existed or was conveyed to divert north channel waters for the benefit of this mill property. But this woolen mill property was the only property which Cowan owned at the time of the Mosher deed in 1822, which the plaintiff now owns. Could Coburn & Coburn, after they received this deed of the woolen mill, have maintained an action against Mosher if he had destroyed Cowan's dam, on the theory that Mosher's covenant to permit Cowan to build the dam was made for the benefit of the woolen mill property? How would they have proved such to have been the intent? Was the covenant for the benefit of other mills on the south shore of the south channel, which Cowan had previously conveyed by perpetual lease? It does not so appear from the covenant itself, nor was Cowan's right of re-entry for failure to pay one peppercorn per year a right of such apparent value that we should expect Cowan to consider that he had any remaining interest whatever to be benefited.

[18] But, assuming that the owner of one of these mills had conceived his rights invaded by Mosher interfering with the dam across the north channel, what standing would he have had in an action to

enforce the covenant, and how would he have succeeded in showing that the covenant was made for the benefit of his mill? Cowan, how- -ever, owned property on the south shore of the island, which had water rights which it is more probable Cowan intended to benefit by the covenant in the Mosher deed, if it can be held that that covenant had reference to bringing north channel waters into the south channel. But that property is not now owned by plaintiff, and cannot be the basis of any right in the plaintiff to maintain this action. Hence we need not stop to point out difficulties which the present owners of that property would encounter in seeking to enforce the covenant. The fact is that there is nothing in their chain of title which indicates that Cowan, in conveying those lands, included any easement or privilege in the north shore dam or to the waters naturally appurtenant to that channel. If we are correct in the conclusions above stated, it seems to follow that the dam across the north channel and the restrictions of the Mosher land against hydraulic works have not operated to confer upon the south channel owners a right to divert any of the waters naturally appurtenant to the shores on the north channel.

These conclusions have been reached, not without some hesitation, in view of the well-merited reputation of the learned referee as an authority upon questions of this character. We think, however, that the conclusions reached are more consistent with many of the leading facts in the history of these water powers than are those of the learned referee. For example, they are consistent with the Beebee cotton mill development and with the so-called Dorwin agreement and award, and the payment thereunder by the owners upon each side of the north channel, respectively, each of one-quarter of the expense of building the dams in both channels after they were destroyed by the flood in 1869, and their payment in the same proportion of the expense of the repair and maintenance of these dams since that time. They are also consistent with the fact that the north channel owners, at the time of the Dorwin agreement, were permitted to fix the location of the dam on that channel according to their own best interest, and they are consistent with the form of the deeds from John C. Knowlton and George W. Knowlton to the plaintiffs, Knowlton Bros., of January 27, 1897, of certain lands on the north bank of the river to the center of the river, including "all the water powers, rights, and privileges apportioned and appurtenant to the same in accordance with the provisions of the so-called Dorwin award," and the warranty deed from Knowlton Bros., the plaintiffs, to the Watertown Electric Light Company, of October 2, 1903, of lands on the north bank of the river, without reserving any of the riparian rights naturally appurtenant to the land conveyed, and the quitclaim deed from Knowlton Bros. to the Watertown Electric Light Company of the same date of land on the north shore of the river to the center of the river, including "all water rights and privileges of every name and nature appertaining thereto or connected therewith," and also with the fact that in all the numerous conveyances of the mills and water rights on the south channel since 1824 down to the present time there is no express grant of an easement to divert north channel waters to the south channel. They are

also more consistent with plaintiff's understanding of its rights as stated in its original complaint, wherein no claim was asserted to a prescriptive right to divert to the south channel the waters of the north half of the north channel.

These views, if correct, will require a new trial of this case, and a disapproval of some of the findings of the learned referee. It seems unnecessary to consider other questions presented upon this appeal. As to some of them there may be other evidence upon another trial.

Our conclusion is that the judgment should be reversed, and a new trial ordered before another referee, with costs to each appellant appearing upon this appeal by separate attorneys, to abide the final award of costs. The following findings of fact, or the parts thereof as stated, are disapproved: Findings of fact Nos. 15, 27, 28, 29, 30, 31, 33, 54, 55, 57, 58, and 80. All concur.

